Judgment rendered October 9, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,772-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MARILYN H. MCBRIDE, DAVY A.                    Plaintiffs-Appellees
DOWDY, AND JOEY E. MILLER

versus

OLD REPUBLIC INSURANCE                         Defendants-Appellants
COMPANY, JOHN K. WOODARD,
DAVID G. BROOKS, SR., AND
ENABLE MIDSTREAM PARTNERS,
LP

* * * * *

Appealed from the
Thirty-Ninth Judicial District Court for the
Parish of Red River, Louisiana
Trial Court No. 37,445

Honorable Luke D. Mitchell, Judge

* * * * *

PATRICK R. JACKSON, APLC               Counsel for Appellants,
By: William Lee Stroud                 John K. Woodard, Enable
    Patrick Richmond Jackson           Midstream Partners
    Ryan O. Goodwin

BRADLEY, MARCHISON, KELLY &            Counsel for Appellees
SHEA, LLC
By: Joseph L. Shea, Jr.
    Joshua Steven Chevallier
    Matthew R. Lee
    Brandon G. Pang

* * * * *

Before PITMAN, ROBINSON, and HUNTER, JJ.

**ROBINSON, J.**

Enable Midstream Partners, LP ("Enable"), appeals a judgment that found it 90% at fault for a pressure-release rupture ("rupture") which occurred at its Magnolia natural gas treatment plant ("plant") located in Ringgold, Louisiana, and which awarded damages to an employee and an independent contractor of White Oak Radiator Services, Inc. ("White Oak"), an independent contractor. For the following reasons, we reverse the judgment insofar as it awarded damages for the independent contractor's alleged lumbar injury. In all other respects, the judgment is affirmed.

## FACTS

White Oak contracted with Enable to remove and replace amine and glycol coolers during a turnaround affecting Magnolia 100, one of the three "train" sections at its plant. The coolers had been fabricated by White Oak. The agreement was memorialized through purchase orders created by Enable. The purchase orders contained a link setting forth the general terms and conditions.

The general terms and conditions stated, in part:

> Seller is an independent contractor. . . . Except as otherwise provided in this Purchase Order, Seller will provide any and all labor, supervision, materials, and equipment necessary to provide the Materials, Services, or Work Product as set forth in this Order[.] Seller will control the means and manner of the providing of the Materials, Services or Work Product. Seller's personnel will not be considered employees of Buyer[.]

The general terms and conditions further stated:

> If Seller performs any work on Buyer's Premises, Seller will comply with all safety and security rules and requirements of Buyer and take all precautions required to prevent injury to persons and property during such installations or work. . . .

Seller shall adhere to Buyer's Personal Protective Equipment (PPE) requirements and Contractor Safety requirements as defined in Contractor General PPE Requirements and Contractor Safety Handbook. Which can be found at [provided link].

Davy Dowdy provided welding services to White Oak as an independent contractor. He executed an independent contractor release, waiver of liability, and covenant not to sue.

John Hemus, who started at White Oak as a draftsman, was responsible for overseeing the project. He made several site visits to the plant, and Kepner Southerland from Enable made several visits to White Oak's facility.

White Oak was not the only contractor at the plant when Magnolia 100 was shut down to upgrade the coolers and for other maintenance work to be performed. The 200 and 300 trains at the plant continued to operate during the turnaround.

The turnaround began at 9:00 a.m. on June 5, 2018. The flow of gas was stopped to Magnolia 100 and the system was depressurized. That night, the system's piping was blown out with compressed air and then valves were opened to bleed any air that was trapped.

Enable's policies and procedures were clear about who could conduct the lockout/tagout at the plant. The "Control of Hazardous Energy Sources (Lockout/Tagout)" policy and procedure stated that only an authorized employee may perform lockout/tagout. It further stated that except for isolation valves immediately upstream and downstream of rental compression, only company authorized employees shall isolate energy for lockout/tagout purposes.

2

White Oak's personnel arrived at the plant on the morning of June 6, 2018. They underwent a site-specific orientation during which they watched a video that focused on plant hazards. Marilyn McBride, White Oak's safety manager, conducted a Job Safety Analysis ("JSA"). No JSA was conducted by Enable. Dowdy recalled that at the JSA, they discussed everything White Oak was going to do that day.

Bryan Garrett, a lead operator at the plant, completed a lockout/tagout form on June 6. He checked off flammable gas/liquids and hazardous chemicals as the types of hazardous energy sources. Garrett wrote that three areas were closed. Those areas were the glycol surge tank valve at the boosters, the glycol booster pumps bypass, and the glycol hp suction block valve.

White Oak's original plan was to unbolt the glycol cooler so it could be lifted out by a crane. However, after it was unbolted, there was not enough clearance for the crane to lift the cooler because of the piping from the cooler. The decision was made by White Oak to use an acetylene torch to cut the piping.

A hot work permit, which ensures that all energy sources are blocked off, was issued by Garrett on June 6 for 7:00 a.m. The permit allowed cutting and grinding to cut the piping from the cooler. Garrett checked off boxes stating that a lockout/tagout energy control procedure had been followed to isolate energy sources and that flammable liquids and vapors had been isolated or rendered safe.

Before approving the hot work permit, Garrett confirmed that everything had been isolated. No gas or ethylene glycol was flowing in

3

plant 100. Garrett saw the open valves and air hoses that were still hooked up to the pipes. He did not see any liquids that would have indicated that not everything had been drained.

Garrett took a gas monitor and tested the work area, around the pipes, and inside the pipe that he understood would be cut. He recorded measurements of zero lower explosive limit ("LEL"). He wrote down his reading on the hot work permit, had Hemus and the fire watch sign the permit, signed it himself, and then gave a copy to Hemus. He told Hemus that they could start, and then he went to work with other contractors.

The hot work permit stated that any person could stop a work activity if, in their opinion, conditions are no longer safe. The "Hot Work Permits" section of the contractor safety handbook provided, "Any person at any time may stop work, if in their opinion, conditions are no longer safe. Hot work shall cease immediately and the hot work permit suspended any time a hazardous condition exists." The introduction section of the contractor safety handbook additionally provided that all employees and contractors have the authority and responsibility to shut down or stop any activity due to an unsafe or perceived unsafe condition.

On the morning of June 6, Dowdy went to Enable's shop where he cut "skillets," which are used to block pipes. After he gave the skillets to McBride, he began setting up his truck at the amine coolers. Once his area was staged, he went to the glycol cooler where Colton Nickerson was working. Nickerson was also an independent contractor welder for White Oak.

Dowdy noticed that a dark liquid had spilled from a pipe and collected on the ground under Nickerson's ladder. The liquid changed the color of the rocks. Dowdy told Nickerson that he would watch the liquid to ensure it did not catch on fire.

Nickerson made a two-inch cut in the pipe with an acetylene torch, then heard a hissing sound. He continued cutting and then the glycol surge tank suddenly erupted. Its end cap blew off and a piece of metal insulation struck White Oak's owner in the leg. Joey Miller, a helper for White Oak, put out the fire that had started in the tank.

Nickerson received first aid for lacerations to his face from McBride. She also administered first aid to Miller for his finger.

*Lawsuit*

On May 31, 2019, McBride, Dowdy, and Miller filed suit against Enable, Enable's liability insurer, Old Republic Insurance Company, and two Enable employees, John Woodard and David Brooks.

They alleged that prior to beginning the work, they were assured by Enable's lead operator at the plant, Woodard, that all the proper safety protocols had been taken, that all lines and tanks had been properly and safely purged of gas or other potentially explosive materials, and that necessary valves and switches had been turned off and properly secured. They also alleged that prior to beginning the work, they were assured by Brooks that all proper safety protocols had been taken.

The plaintiffs alleged that Enable was directly liable for its failure to take the required safety measures before allowing them to begin working.

5

They further alleged that Enable was vicariously liable for the negligent acts and omissions of its employees.

Miller alleged he suffered severe injuries to his shoulder, back, and finger as he attempted to climb down a ladder and clear the area. Dowdy alleged that he suffered severe injuries to his neck and shoulder along with hearing loss. McBride alleged that she suffered injuries to her hip and back from getting knocked into some equipment as she walked toward the tank when the rupture happened.

### Motions for summary judgment

On May 20, 2022, Enable filed motions for summary judgment in which it argued that the exclusive remedy for Dowdy, McBride, and Miller against Enable was in workers' compensation, not in tort.

The motions for summary judgment were denied on July 12, 2022. On September 29, 2022, this court denied Enable's writ application concerning the denial of the three motions for summary judgment. *McBride v. Old Republic Ins. Co.*, 54,899 (La. App. 2 Cir 9/29/22). The supreme court also denied the writ application. *McBride v. Old Republic Ins. Co.*, 22-01614 (La. 12/20/22), 352 So. 3d 85.

### Trial

A bench trial was conducted over nine days in early 2023.

### Joey Miller

Joey Miller testified that he worked as a helper for White Oak. He was holding Nickerson's ladder when the rupture happened. He was blown to the ground by the rupture. He put out the fire because the fire watch guy had run away.

Miller reported his injuries to McBride that day. Miller was taken to a medical clinic by McBride the following day. He testified about the extent of his injuries.

*Marilyn McBride*

Marilyn McBride, White Oak's safety manager, testified that purging of the glycol system was discussed when the plant was visited a couple of months earlier. It was left up to Enable to decide which valves would be opened or closed. She did not have the opportunity to walk with Garrett while the lockout/tagout was being done. White Oak was trying to address the lockout procedure when the issue came up concerning the lack of clearance to lift the cooler.

McBride claimed that she was right around the corner and trying to get to White Oak's owner, John Mattingly, who was standing near the crane, when the rupture occurred. The force threw her backward and nearly knocked her to the ground.

McBride testified that Nickerson was bleeding profusely from his face and that Miller complained that day about his injuries. She rendered first-aid care to both of them. However, nobody needed emergency medical care. She took Miller to a medical clinic the next day. She also testified about her own injuries. She first sought treatment for her alleged injuries in July.

McBride was fired by White Oak in November of 2018. She testified that John Hemus and Zeke Longaria from Enable did not care if she knew about the project. She knew the general plan, but she never received a job plan or the steps that White Oak planned to take to accomplish its goal. She agreed that White Oak did not take safety seriously.

7

McBride never received Enable's contractor safety handbook, and she did not know if White Oak ever received it.

*Davy Dowdy*

Davy Dowdy, a welder by trade, testified that his welding truck and equipment were totaled in a wreck on March 19, 2014. He worked as a shop manager for Next Stream from 2016 until he acquired a new welding truck in February of 2018. He then worked on one pipeline job before he began working as an independent contractor welder for White Oak in May of 2018.

Dowdy testified that he never met with anyone to discuss the scope of his assignment before he arrived at the plant on June 6. He just knew the basic outline of the project. He testified that he took all his directions while at the plant from White Oak personnel.

Dowdy asked Nickerson if he needed anything, then turned and spoke to a crane rigger when the rupture happened. He felt the ground shake and was knocked over without hitting the ground.

Dowdy agreed that it is a welder's responsibility to stop the work if he feels uncomfortable doing the work. He testified that he could not identify the liquid on the ground. Later that day, he stopped work on an amine cooler when he noticed a bigger spill at the amine cooler and was concerned that natural gas was trapped.

Dowdy testified that he never reported any injuries to McBride that day. He continued working for White Oak on the Magnolia project until it was completed nine days later. He then worked for White Oak on another job until he was let go in July of 2018.

8

Dowdy testified that he has worked an average of 30-35 hours per week since the rupture, but his injuries from the rupture caused him to do everything slower and he was exhausted by early afternoon.  He worked building pipe fencing and did some work for another company.  He will return to working on pipelines when his neck is repaired.

Dowdy's alleged hearing loss and the medical treatment for his back and neck from his accident in 2014 until after the rupture are discussed at length in the section of this opinion pertaining to his awards of damages.

### John Mattingly

John Mattingly is the owner of White Oak.  Mattingly testified that Enable was supposed to ensure the system was flushed, cleared, and locked out.  Enable had already purged the system before they got there on June 6, and then he and McBride walked through that morning and checked the lockout/tagout done by Enable.

Mattingly testified that McBride was supposed to be handling all the safety factors on June 6.  She, an Enable employee, and two safety guys sniffed the area in and around the pipe where Nickerson was going to be cutting.  The readings inside the pipe showed no hazards.

Mattingly testified that he was the only person from White Oak who was knocked to the ground.  He also believed that he was closer to the tank than Dowdy was when it ruptured.

Miller was the only person who reported injuries to Mattingly on June 6.  Miller worked the rest of the week before having the weekend off as previously planned.  Dowdy worked at the plant for about two weeks until the job was completed.  Dowdy then worked a field job for White Oak in

9

Shreveport for a month. They worked 10-12 hours a day on the two jobs, and Dowdy never complained to him about any injuries associated with the rupture.

Mattingly believed that Enable did not purge the piping correctly. He did not think that any action or inaction by White Oak caused the rupture.

*Michael Roach*

Michael Roach testified as an expert in the field of fitting and dispensing hearing aids. He is a licensed fitter and dispenser of hearing aids in Texas. He is not an audiologist, and he is not licensed to diagnose the cause of hearing loss. All his hearing aid contracts contain the provision that the client has been advised that an exam or representation made by a licensed hearing aid dispenser is not an exam, diagnosis, or prescription by a provider or surgeon, and must not be regarded as a medical opinion or advice. Roach did not provide a medical diagnosis of Dowdy's hearing loss or opinion as to the cause of any alleged hearing loss.

Roach measures hearing by use of an audiometer. When Dowdy brought his father-in-law in for an appointment on August 14, 2017, Roach tested Dowdy's hearing and found there was no loss. Although Roach's records showed a purchase agreement by Dowdy dated June 6, 2018, he testified that he did not see Roach on that date. Testing conducted on June 18, 2018, showed that Dowdy had a high-frequency hearing loss on the right and left. There was also a purchase order dated June 18, 2018. Dowdy returned to Roach on July 10, 2018, when he was prescribed a different type of hearing aid.

### Dr. Milan Mody

Dr. Milan Mody testified as an expert in orthopedic surgery. He examined Dowdy for the first time on January 26, 2021. Dr. Mody gave estimated costs for a cervical fusion and a lumbar fusion. Dr. Mody's testimony is discussed in greater depth later in this opinion.

### Jeff Caskey

Jeff Caskey, a process safety management coordinator at Enable, conducted the investigation into the rupture. He arrived at the plant around 45 minutes after it happened. Bo Woodard had called him about the rupture. As the accident investigator, his job was to determine the cause of the rupture and try to prevent it from happening again. His investigation reports were sent to Enable's upper management.

McBride and Justin Vardeman, an operations manager from another area, were on his investigative team. Caskey and Brandon Ivey, Enable's health and safety coordinator, conducted interviews. Caskey also looked at the lockout/tagout form and the hot work permit. He learned that air had been used to purge the system. He also learned that the glycol booster pump discharge line that was to be cut had not been purged. He observed that glycol remained in the booster pump discharge line in a dead-leg section of the piping located at the discharge of the booster pumps. He assumed that no readings were taken in the glycol surge tank or in the piping that was to be cut because only one reading was documented. The only injury that he was told about was the injury to Miller's finger.

Caskey testified about Enable's policies and procedures, which track OSHA requirements. All contractors were to be provided with a copy of the

11

contractor safety handbook, but he found no documentation that White Oak received one.

Caskey explained that a lockout/tagout procedure is designed to isolate or eliminate potential energy sources. It is covered under Enable's "Control of Hazardous Energy Sources" policy and procedure. A primary authorized individual ("PAI") is responsible for ensuring adherence to Enable's lockout/tagout procedure. Garrett was the PAI at the time of the rupture. According to Enable's hot work permit policy and procedure, Garrett was to conduct the atmospheric testing and monitoring. Caskey explained the purpose of that was to clear the area prior to the hot work starting.

Caskey determined there were two causal factors of the rupture. The first was that the lockout/tagout had not been done in accordance with Enable's health and safety policies and procedures. The second causal factor was that no LEL readings were taken inside the glycol surge tank or the piping to be cut in accordance with Enable's health and safety policies and procedures.

*Michael Sawyer*

Michael Sawyer testified on behalf of the plaintiffs as an expert in process safety. He was not asked to look at the cause or origin of the rupture from a pure cause or origin standpoint, but he added that becomes a gray issue when discussing what occurred concerning the isolation, the lockout/tagout, and the clearing of the process of any hazardous materials.

In his opinion, the glycol system was not properly isolated. The rupture would not have occurred if the piping had been cleared of hazardous

materials by using an inert gas like nitrogen. Sawyer did not believe that glycol ignited because he thought the cut was made on a vertical pipe, and glycol would not be present unless it "defied gravity." Sawyer believed that there was natural gas or another flammable material in the system when the pipe was cut.

Sawyer testified that the entire reason for the isolation of hazardous energy, the lockout/tagout, and the final hot work permit check was so White Oak could rely on Enable to ensure that it was safe to work.

Sawyer explained that hot work is any work that could generate heat or a spark. He also explained that Enable's policies and procedures do not allow the duties of a PAI or other authorized person to be delegated to a third-party contractor. In addition, only Enable personnel can conduct the lockout and tagout. That is because the plant owner or operator has superior knowledge of the process. In Sawyer's opinion, Enable failed to follow its own policies and procedures and recognized industry standards regarding the issuance of the hot work permit.

It was Enable's responsibility to ensure that the process was cleared and purged so that it was safe to cut the piping. The final check was the hot work permit. Enable failed to do that adequately. Sawyer added that not recording an LEL reading was a violation of Enable's policies and procedures and recognized industry standards.

Sawyer did not consider this to be a very complex case as it was simply that Enable failed to render the process safe enough for the hot work to proceed. He believed that Enable's policies and procedures met OSHA standards, but that Enable failed to follow its own policies and procedures.

Sawyer testified that in essence, Caskey found that Enable violated OSHA standards because a process safety guideline is violated whenever you have a rupture of a process vessel. He agreed with Caskey that Enable violated its own safety policies and procedures.

Sawyer reviewed the deposition of defense expert Marshall Krotenberg after issuing his report, but he did not see anything in it that changed his opinion. He thought it was unnecessary to review any other new depositions since the time that he had written his report.

After the plaintiffs rested, the court dismissed the claims against Brooks and Old Republic.

### *John Hemus*

John Hemus was the supervisor on the project for White Oak. He testified that there were probably four to five site visits to the plant before the project started. There were also two or three meetings. The purpose of the first site visit, which took place two or three months before the project began, was to obtain a general scope of the work. He met with Kepner Southerland during that visit. They determined where the crane needed to be, the size of the crane required, and what parts of the plant would be isolated.

The second site visit was maybe a month before the project started, and Southerland again participated. The purpose of that visit was to look at what White Oak had bid on and to see if anything else needed to be included to get the job done.

Hemus could not remember if it was during the second site visit or later that he discussed with Southerland about the system being blown and

cleared. White Oak asks customers to use an inert gas to purge the system, but customers do not always meet that request. A third meeting was held about a week before the project began. The scope of the work for the removal of the glycol cooler piping was not discussed until they got to the plant on June 6.

Hemus testified that he and Nickerson traced back on the piping to see what valves were open or closed. He mentioned to one of the operators that there were some open valves going to the surge tank, but he was told that it was not a problem and that everything had been locked out and blown down like it should have been. Hemus and Nickerson were satisfied that the work could be done safely based on the lockout/tagout that had been done. No Enable employee was overseeing or directing the work that White Oak was doing.

Hemus testified that in preparation for the hot work permit, air samples were taken of the area and inside of any pipe that was open. They also looked around on the ground for anything that could be flammable.

Hemus testified that he did not hear the rupture but felt it and saw a white cloud. He was sitting in his truck about 60 feet away when the rupture occurred. McBride was walking away from him toward a fence and was not near any plant equipment.

Hemus recalled that Miller complained about his finger on June 6, but he never heard any complaints from McBride that day. Hemus thought the project at the plant involved nine consecutive 15-hour days of work and that Dowdy worked the entire time without complaint.

15

Hemus did not think it was the sludge that ignited, but the gas trapped within the surge tank above the sludge. He did not believe that White Oak did anything wrong regarding the rupture.

*Colton Nickerson*

Colton Nickerson was not fond of White Oak's practices. He testified that White Oak did not know what it was getting into when a field job required welding. Nickerson believed that White Oak did something wrong regarding the rupture because they did not know how to perform the work in the first place.

Nickerson recalled that when the plant job was still in the planning stage, he and Mattingly discussed the piping and the easiest way to get the cooler out. He testified that White Oak could have unbolted the spools of pipe or even cold cut the pipe, but White Oak wanted to do it the hard way.

Nickerson was not involved in filling out the hot work permit, and he did not speak with Hemus about getting it. He did not even know it was being issued. He thought it was unusual that his name was not on it since he was going to do the cutting. He regretted not walking through the lockout with Enable employees during the lockout/tagout procedure. He just assumed the Enable employees knew what to do to keep him safe.

Nickerson recalled that there were four gas monitors in the area, and he had one attached to his chest. A sniffer was stuck inside the glycol cooler and nothing was found where he was cutting. After the pipe was unbolted from the cooler, a reading was taken inside the pipe about four feet from where he was cutting, but nothing was measured.

Nickerson did not recall Dowdy complaining of any injuries or pains when he worked with him following the rupture. While Dowdy did not complain to him about his hearing a couple of days afterward, he did remember Dowdy saying something about it a little later. He did not remember Dowdy complaining about back problems.

### Bryan Garrett

Bryan Garrett was the lead operator at the plant on June 6. He did not participate in any meetings with White Oak, and his only contact with White Oak after they arrived was to approve the hot work permit.

Garrett testified that when plant 100 was closed the night before, locks were placed on motors, fans, and anything else that was an energy source, and the glycol was blown out of the system.

Garrett did not personally do the lockout/tagout procedure. He agreed that as the PAI that day, he was responsible for ensuring that the lockout/tagout was done properly. He verified that the valves were closed as shown on the lockout/tagout document.

Garrett explained that a hot work permit is issued for any cutting, grinding, welding, or use of any spark-producing equipment within a certain distance of the plant process. When White Oak asked for the permit, they did not say where they were going to cut the pipe or how they were going to do it. He did not ask how the pipe was going to be cut.

Garrett did not think there was any glycol in the pipe. When Garrett was asked about natural gas entrained in the liquid glycol, he explained that a glycol sample is tested monthly, and they have never found gas present in it. Garrett also explained that when glycol goes through the system it is

referred to as "rich" because it is saturated with water, but it was "lean" at the point in the piping where Nickerson cut. Garrett stated that before he issued the hot work permit, he did the best he could to ensure there were no flammable or combustible liquids present.

Garrett explained that the booster pumps were normally an energy source between the surge tank and where they were cutting, but the pumps were locked out and not an energy source at the time. The glycol needed to be pumped in order to flow up the pipe. He also explained that if valves were closed, then it isolated the pipe that they were cutting from the surge tank. He believed the only energy source was the torch.

Garrett was unaware of any Enable policy or procedure that required the PAI to remain in the area while the hot work was done. He was 50-60 yards away and walking under the pipe rack toward where White Oak was working when the rupture happened. He ran to the area of the rupture and saw nobody on the ground. No injuries were reported to him.

Garrett testified that Nickerson told him that he made a cut, heard a hissing sound, tested the cutting area with a meter and did not measure anything, cut again, and then the rupture happened. Garrett had left a meter with them so he could check for gas periodically while making rounds. He told Nickerson to shut it down if the meter went off and to find an Enable employee so they could figure out where the gas was coming from.

Garrett testified that he did not take any readings inside of the glycol surge tank. He also testified that he did not know what was in Enable's contractor safety handbook. He considered himself to be somewhat familiar

with Enable's policies and procedures for hot work. However, he believed that he followed all of Enable's policies that day.

Garrett thought the purpose of a JSA is to identify possible hazards and discuss them with the people who will be potentially exposed to them. Enable did not have a JSA coordinator. He acknowledged that Enable's JSA policy and procedure states that the use of work permits does not replace the need for a JSA.

*Leslie Crissup*

Leslie Crissup was a project engineer in Enable's engineering and construction group. She explained that another contractor, Torqsil, also worked on the project installing helical piles for the coolers. She worked with Zeke Longoria, a White Oak employee, about the replacement schedule and the cost of installation. She caused the purchase orders to be issued.

Crissup explained that would-be contractors are given a safety score, and if that safety score is acceptable to Enable, they may be invited to become an approved contactor or vendor. White Oak was an approved contractor and had a vendor number. Crissup also explained that in addition to the link to the contractor safety handbook in the terms and conditions, once a vendor number is generated, the vendor is sent additional documentation about standards for construction and inspection requirements, including the contractor safety handbook.

Crissup testified that after the purchase order is created, it is sent by supply chain to the vendor or contractor, who then clicks on a link in the purchase order to reach an Enable website. She thought that the link to the contractor safety handbook was at the bottom of the website.

19

*John Woodard*

John Woodard was the Operations & Maintenance leader at Enable on June 6, 2018. He was over the plant as well as pipelines and measurements in the area. He explained that nobody held the title of plant manager at the plant. He considered every Enable employee onsite to be a JSA coordinator.

Woodard was at a meeting in Bossier City when the rupture occurred. He did not get to the plant until that evening. Five contractors and a third-party safety group were at the plant on June 6. There were more operators than usual at the plant on June 6 because it is normal for additional people to come in and help with turnarounds. Woodard did not think it was important for him to be present at the plant that day.

Woodard testified that work started on June 5 when the natural gas was blown down, piping removed, and natural gas stopped coming in to plant 100. All glycol was drained and pumped out of the glycol contactor and piping, and the entire glycol skid was empty. Over 3,500 gallons of glycol were removed.

Woodard explained the process at the plant. Amine is an aqueous solution that is 50% water. Gas enters the amine tower, where hydrogen sulfide and carbon dioxide are removed. The gas, which is now totally saturated, then flows into the glycol contactor where the water is removed. The glycol is considered "rich" at that point as it has absorbed the water from the gas. They then strip the water from the glycol to make it "lean" again. Monthly testing of the "rich" and "lean" glycol never shows the presence of hydrocarbons.

Woodard testified that the cut was done on a horizontal section of pipe at a weld. Glycol would not be in a vertical section of the pipe, but in the horizontal section. There was no flow of glycol in the pipe at the time because it was shut down. Any glycol in the vertical pipe would have settled in the bottom of the pipe.

Woodard testified that there was no need to lock out the entire piece of equipment since White Oak was going to do cold cutting. The problem arose when White Oak decided to use a torch. The torch was the energy source because there were no other energy sources. A single weld at the cap gave way because the surge tank was not intended to be a pressure vessel.

Woodard believed that Garrett's actions conformed to Enable's policies and procedures for the issuance of a hot work permit. Woodard testified that Garrett should have shut down the hot work if he was aware the welder was going to use a torch to cut the pipe. He did not think the lockout/tagout procedure had anything to do with the rupture. Even if a correct lockout/tagout had been done, it still could have caused a pressure release somewhere else.

***Marshall Krotenberg***

Marshall Krotenberg testified on behalf of Enable as an expert in workplace health and safety and regulatory standards of care. He explained that workplace safety encompasses process safety management, but they are not the same thing.

Krotenberg's opinion was that the use of the cutting torch on a pipe that contained ethylene glycol heated it to a boil and generated vapors which ignited and caused an over-pressurization of the system culminating in a

blowout at one end of the surge tank. The tank was designed to contain a liquid at ambient pressure, not to take the pressure that was delivered.

Krotenberg believed there was no methane in the pipe because testing prior to the hot work did not identify any of it in the outside air or in the piping. Furthermore, any methane in the pipe would have flashed right away, which did not happen. Instead, there was an ignition of the vapor generated by heating the glycol. Glycol is a combustible liquid that is very difficult to burn, and it has a boiling point of 600°F. Krotenberg estimated that the torch burned at 5,000°F.

Krotenberg did not believe that the failure to adhere to the lockout/tagout procedure was the cause of the rupture. That was because his understanding was there was no glycol in the system that could have flowed to where they were cutting. Further, there was no unexpected release of energy that would have been controlled by a lockout.

Krotenberg thought that Caskey's conclusion that the rupture was caused by the failure to measure gas within the pipe was factually inaccurate and wrong. Gas was not the problem. He thought that putting the torch to the pipe, not the glycol itself, was the hazard.

Krotenberg believed that White Oak's employee training and policies and procedures were inadequate in this particular case because its personnel failed to recognize the significance of residual glycol in the piping and the potential fire hazard even when it was flowing out.

Krotenberg opined that White Oak was a creating employer and an exposing employer when it put the torch to the pipe. White Oak had the responsibility to protect its employees and to control the hazard under

22

OSHA's general duty clause as well as an OSHA regulation requiring that an employer ensure that employees have knowledge of workplace hazards, know how to avoid them, and know to stop if they encounter a hazard. If White Oak employees could not control the hazard, they were to stop work or ask for it to be controlled. Dowdy recognized the hazard when he saw the liquid and was concerned about it catching fire.

Krotenberg offered other opinions: (1) Garrett did not consider the potential hazard created by heating residual glycol; (2) Enable relied on White Oak to have knowledge about glycol liquids and to do the work safely; (3) the work area and piping were inspected and tested prior to starting work; (4) White Oak failed to consider the potential hazard created by heating residual glycol contained within the confined space of a pipe; (5) Nickerson's failure to verify safe conditions before performing hot work caused the rupture; (6) White Oak exposed its workers to fire and over-pressurization hazards caused by the heating and ignition of glycol; (7) White Oak had an obligation to assess workplace hazards, correct identified hazards, and either refuse to work or notify Enable of workplace hazards that White Oak did not have authority to correct; and (8) because White Oak performed hot work regularly and likely came across glycol when doing demolition work, it should have known to ask what the material was and whether it was combustible.

In Krotenberg's view, White Oak should have chosen a different method to separate the pipe or to ensure there was no residual glycol in the pipe if they were going to heat it with a torch. Nickerson did hot work on

23

the piping without verifying that conditions were safe. He ignored or did not fully appreciate the risk from the glycol.

Krotenberg thought it was incorrect to say that nothing done by either Enable or White Oak could have prevented the rupture. It could have been prevented by unbolting the pipe or using some cutting method that did not create heat.

Krotenberg thought it was important for companies like Enable to provide safety handbooks to contractors. Enable was a controlling employer in this, but not an exposing employer because no Enable employee was nearby at the time of the rupture. Enable was not a creating employer either because none of its employees put a torch to the pipe. White Oak and Enable were both correcting employers.

Krotenberg did not agree that an Enable supervisor had the responsibility to convey anticipated chemical hazards to contractors because that is too broad a responsibility. However, they should convey recognized chemical hazards and what to do if there is a release. He thought Garrett complied with 99% of Enable's hot work authorization policy and procedure. He did not know if Garrett failed to recognize the hazard presented by glycol in the piping or if he was unsure about the cutting method. He testified in his deposition that he thought Caskey's report was ridiculous.

*Judgment*

On March 29, 2023, the court rendered judgment finding that Enable was 90% at fault and White Oak 10% at fault for the rupture. No other party was found at fault. Enable's negligence caused damage to Dowdy and

24

Miller, but not to McBride.  Miller was awarded damages of $109,376.20.

Dowdy was awarded damages of $531,139.59.  The damage awards

included a 10% reduction because of White Oak's negligence, and in

Dowdy's case, a 20% reduction because of his pre-existing lumbar and

cervical spine conditions.

Enable filed a suspensive appeal.  The trial court's written ruling

reads, in relevant parts:

LIABILITY:
IT IS ORDERED, ADJUDGED AND DECREED, after
considering the evidence and application of comparative fault,
that Enable Midstream Partners, LP (hereinafter referred to as
Enable) is ninety percent (90%) at fault/liable, White Oak
Radiator Services (hereinafter referred to as White Oak) is ten
percent (10%) at fault/liable, and John K. "Bo" Woodard is zero
percent (0%) at fault/liable.  Reasons for judgment are as
follows:

Enable had full custody and control of the Magnolia Enable
Plant.  They had full knowledge and understanding of the day
to day functions of the plant.  It was their responsibility to
properly purge, lock out and tag out the plant systems for the
work at hand.  There were questions at trial whether the work to
be performed should have been cold work versus hot work.
This confusion by Enable may have contributed to the manner
in which Enable purged the plant.  Ultimately, Enable issued a
hot work permit authorizing White Oak employees to perform
hot work in the area.  While they did take some precautions,
Enable failed to remove all the ethylene glycol from the area
where hot work was being performed, thus resulting in a
catastrophic event caused by the combustion of the ethylene
glycol.

Further, Enable failed to ensure that White Oak was familiar
with and trained in Enable's policies and procedures for
conducting work at the Magnolia Enable Plant.  The policy and
procedure manual was made available to White Oak through an
overly burdensome online process through links hidden in the
fine print of the bid process and electronic links of policy
within policy.  Enable did not provide White Oak with any
safety training in conformity with Enable's policies and
procedures.  They also failed to comply with their own policy
and procedure by failing to have a copy of the policy and
procedure manual on site at the Magnolia Enable Plant.

White Oak is apportioned some fault for two reasons. First, they failed to train and provide its employees with a copy of Enable's policies and procedures. However, White Oak's ability to provide such training and making Enable's policy and procedure manual available to its employees was limited due to the fact that Enable's electronic access to the policies and procedures was overly burdensome. Secondly, White Oak employees should have known there was a possibility of hazardous material near the hot work when they observed a liquid substance leaking from the glycol cooler at or near the hot work area while the hot work was being performed. White Oak employees should have stopped the hot work and notified Enable of their observation of a potential work hazard. However, White Oak was operating under the assumption that Enable was safe work conditions for the hot work that Enable authorized.

. . . . .

DAVY A. DOWDY:

As a result of the event at the Magnolia Enable Plant, Mr. Dowdy suffered permanent hearing loss, injuries to the cervical spine and injuries to the lumbar spine. Testimony and evidence were provided at trial that Mr. Dowdy did not have hearing loss prior to the event but did have some preexisting conditions to the lumbar and cervical spine. However, evidence was sufficient to show that medical treatment on all preexisting conditions had ceased prior to the event, and Mr. Dowdy was in relatively good health. After the event, both cervical and lumbar spine injuries were discovered to vertebrae that were not preexisting. Therefore, this court finds that the "Housley Presumption" applies in Mr. Dowdy's case, related to those areas that did not exist prior to the event. Evidence was provided that Mr. Dowdy sought medical treatment for said injuries. Mr. Dowdy's cervical and lumbar spine injuries will require both surgery and aftercare as a result of the event. There was no supporting evidence presented that Mr. Dowdy would require aftercare or future medical expenses for his hearing loss. Mr. Dowdy accumulated past medical expenses, and he is entitled to an award for those special damages in the amount of $58,955.10. For the permanent loss of hearing, past pain and suffering, and future pain and suffering, Mr. DOWDY is entitled to general damages in the amount of $100,000.00. For injuries to the cervical spine, past pain and suffering, and future pain and suffering, Mr. DOWDY is entitled to general damages in the amount of $100,000.00. For injuries to the lumbar spine, past pain and suffering, and future pain and suffering, Mr. DOWDY is entitled to general damages in the amount of $100,000.00. Mr. Dowdy is also entitled to general

damages for injuries to his cervical spine for future medical and aftercare in the amount of $209,000.00, and for injuries to the lumbar spine in the amount $130,000.00. All general damages related to injuries to the cervical spine and lumbar spine are reduced by one fifth (1/5) due to Mr. Dowdy's preexisting conditions. Further, the total award is reduced by ten percent due to the comparative fault of White Oak.

**DISCUSSION**

*Workers' compensation*

Enable argues on appeal that because Dowdy and Miller were engaged in manual labor for Enable's independent contractor at the time of the rupture, their exclusive remedy is under the Louisiana Workers' Compensation Act ("LWCA").

La. R.S. 23:1021(7) states that independent contractors are "expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter." This is known as the manual labor exception.

Enable contends that the trial court ruled incorrectly as a matter of law that employees of independent contractors who are engaged in manual labor at the time of their alleged injuries are not covered by the manual labor exception in tort actions against the principal. It is Enable's position that the trial court mistakenly relied on the *Erie*-guess concerning the manual labor exception that was made by the United States Fifth Circuit Court of Appeals in *Jorge-Chavelas v. Louisiana Farm Bureau Casualty Insurance Company*, 917 F. 3d 847 (5th Cir. 2019).

27

Enable maintains that because it is undisputed that White Oak was Enable's independent contractor and that Dowdy and Miller were engaged in manual labor for White Oak at the time of the rupture, the question before this court is whether the manual labor exception applies to employees and independent contractors of independent contractors. Enable contends that the other appellate courts of this state have concluded it does.

A party seeking to avail itself of the immunity from tort liability granted under the LWCA has the burden of proving entitlement to such immunity. *Champagne v. American Alternative Ins. Corp.*, 12-1697 (La. 3/19/13), 112 So. 3d 179.

Enable cites five cases in support of its position that the manual labor exception applies to manual laborers performing work on behalf of independent contractors. Those cases are: (i) *Lumar v. Zappe Endeavors, L.L.C.*, 06-317 (La. App. 5 Cir. 10/31/06), 946 So. 2d 188; (ii) *Moss v. Tommasi Const., Inc.*, 09-1419 (La. App. 3 Cir. 5/5/10), 37 So. 3d 492, *writ denied*, 10-1243 (La. 9/17/10), 45 So. 3d 1054, and 10-1306 (La. 9/17/10), 45 So. 3d 1057; (iii) *Courtney v. Fletcher Trucking*, 12-0434 (La. App. 1 Cir. 12/21/12), 111 So. 3d 411; (iv) *Orozco v. Filser Construction*, 18-0274 (La. App. 4 Cir. 10/3/18), 318 So. 3d 99, *writ denied*, 18-1803 (La. 2/11/19), 263 So. 3d 898; and (v) *Knox v. Elite Protection Solutions*, 21-0419 (La. App. 4 Cir. 10/13/21), 366 So. 3d 341.

In *Lumar, supra*, Zappe contracted with Aramark for cleaning services at Zappe's factory. Lumar, who was employed by Aramark, filed a tort claim against Zappe after she was injured at Zappe's factory when her hand became caught in the conveyor belt of a machine that she was cleaning.

Zappe filed a motion for summary judgment in which it contended that workers' compensation was Lumar's exclusive remedy because she was an independent contractor performing manual labor. Lumar argued that she was not an independent contractor, but an employee of an independent contractor and not limited by the exclusivity provisions of the LWCA. The trial court granted summary judgment, concluding that Lumar fell within the class of independent contractors which perform manual labor. The appellate court agreed with the trial court and concluded that the limitations applicable to Aramark were also applicable to its employees. The court noted that La. R.S. 23:1021(7) "does not state that it is not applicable to independent contractors who are partnerships, corporations or other juridical persons, and does not limit itself to independent contractors who are natural persons only." *Id.*, 06-317 at pp. 5-6, 946 So. 2d at 191.

In *Moss*, *supra*, Shaw, who was building an apartment complex, hired Darson to work as a subcontractor on the project. Moss, who was employed by Darson, suffered injuries when he fell from a scaffold while working on the project. The WCJ determined that Shaw was responsible for Moss's workers' compensation benefits. The appellate court cited *Zappe* with approval and concluded that because the factual relationship between Moss and Shaw was identical to that between Lumar and Zappe, the analysis in *Zappe* supported the WCJ's conclusion.

In *Courtney*, *supra*, Maximum Leisure, which was building a subdivision, hired Fletcher Trucking to perform work to develop the property. Courtney, a laborer for Fletcher Trucking, was shot while excavating dirt in the subdivision. The WCJ found that under the manual

labor exception, Courtney was an employee of Maximum Leisure at the time he was shot and awarded benefits to him. The appellate court concluded that both Maximum Leisure and Fletcher Truck owed benefits to Courtney. Citing *Lumar* in a footnote, the first circuit stated that a finding that Courtney was an employee of Fletcher Trucking and not an independent contractor himself would not change the result because Fletcher Trucking performed manual labor duties through its employees.

In *Orozco*, *supra*, Serna was working for Filser, a construction company performing work for Aries, which was performing work for the United States Navy. Serna was killed in an accident while moving trailers at a Navy facility. A workers' compensation claim asserted that Filser was Serna's employer and that Aries was his statutory employer. The WCJ found that Serna was an independent contractor and that the manual labor exception did not apply. The appellate court stated that the finding that Serna was an independent contractor did not end the inquiry concerning his employment status. It concluded that the WCJ's finding that the claimants failed to present sufficient evidence that the manual labor exception applied was manifestly erroneous.

In *Knox*, *supra*, Knox was an independent contractor hired by Elite to work as a security guard at various business locations, including a chicken restaurant where Knox was shot in the neck while working. Knox filed a workers' compensation claim. The restaurant and its insurer filed a motion for summary judgment in which they argued that Knox's status as an independent contractor meant that Knox was not entitled to workers' compensation benefits. The WCJ denied the motion, concluding there was a

genuine issue of material fact surrounding whether the manual labor exception applied. The appellate court reversed, finding that Knox could only prove one of the four factors to establish the manual labor exception.

Enable takes exception to the case relied on by the trial court when denying the motions for summary judgment. In *Jorge-Chavelas v. Louisiana Farm Bureau*, *supra*, the plaintiffs were hired by Lowery to plant sugarcane on a farm operated by one of Lowery's clients, Harang Sugars. They were injured when an employee of Harang drove into their cart and crushed their legs.

The federal appellate court rejected the argument that the manual labor exception applied to employees of independent contractors. The court first turned to the language of La. R.S. 23:1021(7) and noted that while it excluded most independent contractors but granted coverage to independent contractors who spent a "substantial part" of their time providing "manual labor," in either situation the statute addressed only independent contractors. Further, an independent contractor is one who contracts with the principal. The plaintiffs were not Harang's contractors as they never entered into an express or implied agreement with Harang.

The *Jorge-Chavelas* court also considered additional language in La. R.S. 23:1021(7) as confirmation that the statute refers to an independent contractor in the ordinary sense of the term; that is, one who has a contractual relationship with the principal. The manual labor exception only applies to when "a substantial part of the work time of an independent contractor is spent in manual labor *by him* in carrying out the terms of *the contract*." (Emphasis added). As the court noted, employees of an

independent contractor are usually not parties to the contract between the principal and the contractor.

The court addressed the holdings in *Lumar*, *Courtney*, and *Moss*, and remarked that "[t]hree decisions do not *jurisprudence constante* make." *Jorge-Chavelas*, 917 F. 3d at 853. It added that the court which first addressed the rule in *Lumar*, the Louisiana Fifth Circuit, had since denied a claim for workers' compensation brought by an independent contractor's employee against the contractor's principal. *Daigle v. McGee Backhoe & Dozer Service*, 08-1183 (La. App. 5 Cir. 4/28/09), 16 So. 3d 4, *writ denied*, 09-1372 (La. 10/2/09), 18 So. 3d 113. The *Jorge-Chavelas* court also noted that the majority in *Daigle* proposed that a contractor's employee is eligible for workers' compensation against his employer's principal, if at all, through another statute, La. R.S. 23:1061, which defines "statutory employment."

Further examining La. R.S. 23:1061, the *Jorge-Chavelas* court explained:

> That statute authorizes, in certain circumstances, a claim for workers' compensation by a contractor's employee against the contractor's principal "**as if** he were [that] principal's employee." 13 H. Alston Johnson III, La. Civ. Law Treatise, Workers' Compensation Law and Practice § 121 (5th ed. 2018) (emphasis in original).

> Other Louisiana courts have likewise analyzed cases like this one through the lens of statutory employment, explaining that section 1061 "provides guidance as to when a contractor's employee, rather than the contractor himself, may recover under the principal's workers' compensation liability." *Miller v. Higginbottom*, 768 So. 2d 127, 132 (La. App. 2 Cir. 2000); *see also Prejean v. Maint. Enters., Inc.*, 8 So. 3d 766, 770 (La. App. 4 Cir. 2009); *Poirrier v. Cajun Insulation, Inc.*, 459 So. 2d 737, 738–39 (La. App. 4 Cir. 1984). Louisiana's leading workers' compensation treatise agrees that statutory employment is the proper framework for analyzing whether the employee of an independent contractor can recover workers' compensation from the principal. *See* Johnson III, *supra* § 82

(noting the contractor's pursuit of compensation would be analyzed under section 1021(7) while his employee "must seek compensation under the different test of [section] 1061").

That makes sense as the terms of the statutory employment statute directly address the employee-of-an-independent-contractor situation we confront. When applicable, workers' compensation is the exclusive remedy for a contractor's employee against the principal. La. Rev. Stat. Ann. § 23:1061(A)(1). The catch is that the relationship must be formed by contract. *Id.* § 23:1061(A)(3). [FN 7] No such contract exists in this case, which explains why Farm Bureau does not seek section 1061's help. But the existence of this express avenue for employees of contractors to seek workers' compensation from a principal (and in turn for those principals to seek immunity) further supports limiting section 1021(7) to independent contractors themselves, not their employees. La. Civ. Code Ann. art. 13 ("Laws on the same subject matter must be interpreted in reference to each other."); *Fontenot v. Reddell Vidrine Water Dist.*, 836 So. 2d 14, 28 (La. 2003) ("It is a fundamental rule of statutory construction that when two statutes deal with the same subject matter, the statute specifically directed to the matter at issue must prevail as an exception to the more general statute.").

Sections 1021(7) and 1061 are both deviations from typical workers' compensation principles, but they serve different purposes. Section 1021(7) protects a specific class of independent contractors who would not otherwise be entitled to benefits. It was added because, when it came to manual laborers, the "distinction between contractor and employee had become so tenuous and so difficult to administer that the cases were in a state of almost hopeless confusion, and many injustices were apparent." Johnson III, *supra* § 78. To settle the seemingly interminable debate, the Louisiana legislature resolved that those who contracted to do manual labor were entitled to benefits, no matter what a multifactor test said about their relationship to the principal. *Id.*

[FN 7] There is another way to create the statutory employment relationship known as the "two contract" theory, but it is not applicable to this case. La. Rev. Stat. Ann. § 23:1061(A)(2); *see also Allen v. Ernest N. Morial-New Orleans Exhibition Hall Auth.*, 842 So. 2d 373, 379 (La. 2003).

*Id.*, 917 F. 3d at 853-4.

In *Miller v. Higginbottom*, 33,594 (La. App. 2 Cir. 6/21/00), 768 So.

2d 127, *writ denied*, 00-2198 (La. 10/13/00), 771 So. 2d 652, the claimant

was the mother of Miller, who died after suffering injuries while working in the dunking booth at the Louisiana State Fair. Miller was an employee of Higginbottom, who was an independent contractor operating the dunking booth. The WCJ denied the claim against the Fair for death benefits.

The mother maintained on appeal that the Fair was the statutory employer of Higginbottom and Miller. She contended that the operation of the dunking booth by Higginbottom was the performance of manual labor under the manual labor exception. However, this court concluded that the record failed to show that Higginbottom performed manual labor for the Fair. This court stated that the manual labor exception was not applicable to afford workers' compensation benefits by the Fair to Higginbottom and his employees. This court then turned its analysis to La. R.S. 23:1061, which "provides guidance as to when a contractor's employee, rather than the contractor himself, may recover under the principal's workers' compensation liability." *Id.*, 33,594 at p. 7, 768 So. 2d at 132.

In *Loflin v. International Paper Co.*, 34,976 (La. App. 2 Cir. 8/22/01), 793 So. 2d 533, International Paper contracted with Woods Tank to repair or rebuild a tank at its mill in Bastrop. Loflin, who was a welder employed by Woods Tank, was injured when water gushed from the tank and knocked him from a ladder. Loflin filed a tort suit against International Paper, which successfully moved for summary judgment on the grounds that Loflin was its statutory employee under La. R.S. 23:1061. This court affirmed the judgment.

We find the *Erie*-guess analysis in *Jorge-Chavelas* to be persuasive. We are also mindful that because the workers' compensation statutes are in

34

derogation of the universal right to sue for damages provided by La. C.C. art. 2315, the immunity provisions must be strictly construed. *French v. Claiborne Parish Police Jury*, 52,192 (La. App. 2 Cir. 6/27/18), 251 So. 3d 571, *writ denied*, 18-1470 (La. 11/20/18), 257 So. 3d 188. Therefore, we conclude that the manual labor exception presented in La. R.S. 23:1021(7) is limited to the independent contractor and not that independent contractor's employees or its independent contractors. We also note that La. R.S. 23:1061 is under Subpart C, which is titled, "Liability of Principal to Employees of Independent Contractor." Enable does not argue on appeal for the application of La. R.S. 23:1061.

***Superseding and intervening cause***

Enable contends on appeal that the trial court erred in not applying the doctrine of superseding and intervening cause to when Dowdy and White Oak recognized the hazard presented by the liquid glycol in the pipe and failed to stop the work. Enable contends that this failure to apply the doctrine of superseding and intervening cause was a legal error that interdicted the trial court's determination that Enable and White Oak were 90% and 10% at fault respectively for the rupture, necessitating *de novo* review.

In *Johnson v. Morehouse General Hosp.*, 10-0387 (La. 5/10/11), pp. 43-44, 63 So. 3d 87, 116, the supreme court explained the doctrine of superseding or intervening cause as follows:

> A superseding or intervening cause is one which comes into play after the defendant's negligent conduct has ceased, but before the plaintiff suffers injury. In situations in which there is an intervening force that comes into play to produce the plaintiff's injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved

35

> of the consequences of his or her negligence unless the intervening cause superseded the original negligence and alone produced the injury. If the original tortfeasor could or should have reasonably foreseen that the accident might occur, he or she will be liable notwithstanding the intervening cause. In sum, foreseeable intervening forces are within the scope of the original risk, and hence of the original tortfeasor's negligence.

Citations omitted.

Enable maintains that the trial court made specific factual findings that White Oak caused the rupture. More particularly, the trial court found that:

> White Oak employees should have known there was a possibility of hazardous material near the hot work when they observed a liquid substance leaking from the glycol cooler at or near the hot work area while the hot work was being performed. White Oak employees should have stopped the hot work and notified Enable of their observation of a potential work hazard.

Enable emphasizes that the recognition of the hazard occurred after any alleged negligence by Enable.

Enable argues that if White Oak and Dowdy had stopped work when they saw and recognized the actual hazard, then the rupture would not have occurred. Enable further argues that White Oak's decision to use the torch after seeing the presence of glycol in the pipe was unforeseeable by Enable.

While Dowdy noticed the liquid on the ground and watched it to ensure that it did not catch on fire, the record is clear that the rupture would not have occurred if Enable had properly purged the piping of any glycol residue. In addition, it was certainly foreseeable to Enable what might occur if it issued a hot work permit when liquid glycol remained in the pipe. While Enable may not have known that Nickerson would use a torch to cut the pipe, the use of a torch falls within the parameters of hot work. This

36

argument is without merit. The trial court was correct in not applying the doctrine of superseding and intervening cause.

***Asserted Legal Errors***

A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731; *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). However, where one or more legal errors interdict the factfinding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record. *Evans v. Lungrin*, *supra*. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *Id*. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *Id*.

Enable contends that fault was allocated to it for failing to stop White Oak from causing the rupture. Enable argues that it is entitled to *de novo* review for this court to correct the allocation of fault because the factfinding process was interdicted by three legal errors.

Enable first maintains that the trial court committed legal error when it improperly imposed a duty on Enable to correct White Oak's unsafe work practices. We disagree with this assertion.

The trial court never imposed a duty on Enable to correct White Oak's work practices. In fact, the reasons for judgment list Enable's responsibilities, including to properly purge and lock out the plant systems, to determine whether a hot work permit should be issued, to remove all

37

ethylene glycol from where the hot work was to be performed, and to ensure that White Oak was familiar with and trained in its policies and procedures.

Enable contends the trial court relieved White Oak of liability and imposed liability on Enable despite finding that: (1) White Oak failed to properly train its employees; (2) White Oak saw and recognized the hazard before using the torch; and (3) White Oak failed to stop the work. However, those findings served as the basis for the trial court allocating some fault to White Oak, although not to the percentage sought by Enable.

Enable next argues that the trial court erred in assigning fault to Enable for White Oak's negligence by misapplying the law governing a principal's liability for its independent contractor's negligence. In general, a principal is not liable for the offenses committed by an independent contractor while performing its contractual duties. *Thompson v. Winn-Dixie Montgomery, Inc.*, 15-0477 (La. 10/14/15), 181 So. 3d 656. There are two exceptions to this general rule: (1) when the work is ultra-hazardous; or (2) when the principal reserves the right to supervise or control the work of the independent contractor. *Id*. Enable contends that neither exception applies to the work performed by White Oak at the plant.

Again, the trial court found both Enable and White Oak to be negligent but to different degrees. The court recognized that Enable had full custody and control over the plant, and that Enable failed to remove all the ethylene glycol from the hot work area. The court also recognized that Enable failed to ensure White Oak was familiar with and trained in Enable's policies and procedures and that Enable failed to provide any safety training required by its policies and procedures. This argument is without merit.

38

Finally, Enable contends that the trial court erred in its application of Louisiana law concerning contracts when it recognized that White Oak failed to train and provide its employes with a copy of Enable's policies and procedures, but then relieved White Oak of fault in this regard by concluding that White Oaks' ability to do so was limited by Enable's burdensome electronic access to its policies and procedures. Enable argues that this led the trial court to assign more fault to Enable than it otherwise would have.

Enable notes that it is a well-accepted practice that separate documents may be incorporated into a contract by attachment or reference thereto. Enable cites *Action Finance Corp. v. Nichols*, 180 So. 2d 81, 83 (La. App. 2 Cir. 1965), where this court stated, "[o]ther writings referred to in an instrument, it has been uniformly held, become a part of the agreement between the parties with the same force and effect as if the provisions had been contained in the basic contract where the parties intended it to have such effect."

Enable maintains that the mention on the purchase order that terms and conditions could be found elsewhere was sufficient to put White Oak on notice that other terms and conditions were incorporated into the purchase order.

We disagree with Enable on this contention. The trial court never ruled that Enable's policies and procedures were not incorporated into the contract by reference. The court merely concluded that Enable's electronic access to its policies and procedures was overly burdensome, with which we agree. The policies and procedures were available, but White Oak had to take additional steps to obtain them. The purchase order contained a link to

its terms and conditions on Enable's webpage. On that page was a link to Enable's contractor safety handbook. This is not the same as a separate writing in paper form being provided to a party. Enable's argument is without merit.

### *Allocation of fault*

Enable argues that if this court finds that White Oak's negligence was not a superseding and intervening cause of the accident, then the trial court was clearly wrong in not assigning any fault to Dowdy, who recognized and identified the hazard created by White Oak's work, or in not allocating at least 90% of fault to White Oak. In support of its argument, Enable cites *Malta v. Herbert S. Hiller Corporation*, 21-00209 (La. 10/10/21), 333 So. 3d 384, and *Gross v. Exxon Corp.*, 885 F. Supp. 899 (M.D. La. 1994).

In *Malta*, the plaintiff was injured when a cylinder that is part of a fire-suppressant system discharged while the plaintiff was moving it after it had been uploaded to an oil-production platform. The owner of the platform was found to be not at fault. In *Gross*, the plant owner was determined to be 5% at fault for an explosion that occurred while Gross's employer, an independent contractor, was doing electrical work. The plant had been made aware that Gross was engaged in an unsafe practice on its premises.

A trial court's allocation of fault is a factual determination, and as such, is subject to manifest error review. *Criswell v. Kelley*, 54,188 (La. App. 2 Cir. 3/9/22), 335 So. 3d 483. The allocation of fault is not an exact science or search for one precise ratio, but rather the search for an acceptable range, and an allocation by the factfinder within that range cannot be clearly wrong. *Id.*

40

An appellate court's determination of whether the trial court was clearly wrong in its allocation of fault is guided by the factors set forth in *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So. 2d 967 (La. 1985). *Hankton v. State*, 20-00462 (La. 12/1/20), 315 So. 3d 1278. Those factors are: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.

Enable maintains that its only conduct possibly giving rise to liability was the issuance of the hot work permit, which it did without knowledge that White Oak was going to use a torch and before White Oak realized that glycol remained in the pipe. However, this position ignores that Enable had the duty before White Oak began work to ensure that no liquid glycol remained in the pipe. In addition, because the permit was for hot work, Enable should have contemplated that a torch could be used.

The trial court specifically found several failures on Enable's part. Despite its responsibility to properly purge the plant system, Enable failed to remove all the ethylene glycol from the area where the hot work was to be done. Enable failed to ensure that White Oak was familiar with and trained in Enable's policies and procedures for conducting work at the plant. Enable failed to comply with its own policies and procedures by not having a copy of the policies and procedures manual onsite. The court then found two failures by White Oak. First, White Oak failed to train and provide its employees with a copy of Enable's policies and procedures. However, the

41

court recognized that White Oak's ability to do so was hampered by Enable's overly burdensome electronic access to its policies and procedures. Second, White Oak's employees should have known there was the possibility of hazardous material near the hot work when they saw a liquid substance leaking in the area. They should have stopped the work and notified Enable. However, they were operating under the assumption that Enable presented safe work conditions for the hot work authorized by Enable.

Considering these findings made by the trial court, assigning 90% of fault to Enable was within the acceptable range. Any fault potentially attributable to Dowdy was surely considered by the trial court when it allocated 10% of fault for the rupture to White Oak. Although Dowdy first saw the liquid, he made Nickerson aware of it, but Nickerson did not act upon this information.

### Dowdy's injuries

Enable argues that Dowdy did not fall to the ground from the rupture, did not report any injuries on the date of the rupture, did not treat for any back or neck injuries allegedly related to it until September of 2018, and was inconsistent in his testimony about the purchase of hearing aids.

Enable contends that the trial court erred in applying the *Housley* presumption to Dowdy's claims of back and neck injuries from the rupture because the court was clearly wrong in finding that Dowdy was in relatively good health before it even though his pre-existing back and neck injuries had not resolved before the rupture. Enable points out that Dowdy received treatment for injuries to his lumbar and cervical spines from 2012 and

42

through at least February of 2018, and stopped treatment then, not because his pain had resolved, but because he no longer had health insurance. Cervical spine surgery was also recommended following his 2014 motor vehicle accident, but he never had the surgery because there were not enough funds in his settlement from a lawsuit related to the auto accident. Thus, according to Enable, the finding of causation based on the *Housley* presumption was not supported by the record.

In a personal injury lawsuit, the plaintiff has the burden of proving by a preponderance of the evidence a causal connection between the accident and injuries. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La. 2/20/95), 650 So. 2d 757; *Davis v. Wheeler*, 53,233 (La. App. 2 Cir. 3/4/20), 293 So. 3d 173, *writ denied*, 20-00781 (La. 10/14/20), 302 So. 3d 1124. The plaintiff satisfies this burden by proving through medical and lay testimony that it was more probable than not that the injury was caused by the accident. *Davis v. Wheeler*, *supra*.

To obtain the benefit of the presumption of causation described in *Housley v. Cerise*, 579 So. 2d 973 (La. 1991), a plaintiff must show: (1) that he or she was in good health prior to the accident at issue; (2) that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterward; and (3) through evidence, either medical, circumstantial or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. *Zimmerman v. Progressive Sec. Ins. Co.*, 49,982 (La. App. 2 Cir. 8/12/15), 174 So. 3d 1230, *writ denied*, 15-1955 (La. 11/30/15), 184 So. 3d 36. If a plaintiff can show these three elements, then she is entitled to a presumption

of causation and the burden of proof shifts to the defendant to prove some other particular incident could have caused the injury of which the plaintiff complains. *Goldsby v. Blocker Through Dept. of Transp. & Dev.*, 51,584 (La. App. 2 Cir. 9/27/17), 244 So. 3d 703.

Whether an accident caused a person's injuries is a question of fact, and an appellate court may not set aside a finding of fact made by a judge or jury in the absence of manifest error or unless it is clearly wrong. *Davis v. Wheeler*, *supra*.

Dowdy went to Care First on March 21, 2014, following his auto accident. He complained of pain in the cervical, thoracic, and lumbar spine, left chest, and left shoulder region. He reported that he was nauseated that morning because he was in so much pain. He was positive for pain in the cervical, thoracic, and lumbar spine, left chest, and left shoulder. His active range of motion in the cervical spine was decreased in all planes with pain at the end range. Two years before his auto accident, Dowdy had given a history of back pain when he sought medical treatment.

Dowdy returned to Care First on April 16, 2014, to review MRI results from a day earlier. The MRI of the cervical spine showed: (1) at the C4-C5 level there was a mild diffuse annular disc protrusion, and uncovertebral arthrosis was noted with mild right neural foraminal stenosis; (2) disc degenerative narrowing at C5-6 with a broad-based mild diffuse annular disc bulge; (3) mild central acquired spinal stenosis, and mild bilateral neural foraminal stenosis secondary to the mild annular disc protrusion, as well as uncovertebral arthrosis; and (4) broad-based mild annular disc protrusion at C6-C7 with mild central acquired spinal stenosis.

44

The MRI of the lumbar spine showed: (1) disc degenerative narrowing at L5-S1 with a broad-based mild diffuse annular disc protrusion, facet hypertrophy/arthrosis with mild left neural foraminal stenosis, but no evidence of severe central spinal canal stenosis; (2) no evidence of disc protrusion or herniation at the T12-L1, L1-L2, L2-L3, L3-L4, or L4-L5 levels; and (3) mild facet hypertrophy at L4-L5 and L3-L4.

Dowdy was seen as a new patient by Dr. Charles Gordon on May 1, 2014.  He complained of neck pain, occipital head pain, right scapular pain, numbness, and tingling paresthesia in his left arm and hand.  He also had severe low back pain off to the left of the midline.  He gave a past medical history of arthritis.  He also gave a history of some neck pain and back pain before the accident, but it had been significantly worse since the accident.

When Dr. Gordon reviewed the April 2014 MRI images, he saw degenerative and spondylytic changes at C4-C5, C5-C6, and C6-C7 with some disc disruption-type changes.  There was disc protrusion at C6-C7 that indented the anterior thecal sac and caused some canal and foraminal narrowing.  Dr. Gordon thought his lumbar spine looked quite good except for at what appeared to be the L5-S1 level. He also thought Dowdy had a transitional segment.  L5-S1 had severe degenerative disc changes, disc disruption changes, endplate edema, and central disc protrusion indenting the anterior thecal sac with minimal canal stenosis.  There was some bilateral foraminal narrowing.  He appeared to have a small annular tear at L5-S1.

Dr. Gordon wrote that he would consider surgery on the cervical spine once Dowdy was healed from his lumbar spine surgery.  He thought Dowdy

clearly would have to have the C6-C7 level addressed. The C4-C5 and C5-C6 levels also looked suspicious to Dr. Gordon.

Dowdy returned to Dr. Gordon on June 5, 2014. Dowdy complained that his back was bothering him more than his neck. He told Dr. Gordon that he had pre-existing neck and back pain before the accident and had had treatment for it, but the accident converted his pain from tolerable to intolerable. Dr. Gordon was able to review a cervical spine MRI from April 12, 2010. It showed mild degenerative changes at C4-C5 and C5-C6 and a minimal bulge at C6-C7. Dr. Gordon noted that his films from after the accident looked substantially different at every level, particularly at the C6-C7 level where he saw some edema in the endplates.

Regarding the lumbar spine MRI from April 15, 2014, Dr. Gordon noted there was a transitional segment with a broad-based bulge at L5-S1. That appeared to him to be a combination of degenerative and traumatic forces in that there was a posterior disc bulge and edema at the L5-S1 level. Dr. Gordon suspected that Dowdy had some pre-existing degenerative disease that was aggravated substantially at the time of the accident commensurate with his history.

Dr. Gordon performed the fusion surgery at L5-S1 on June 13, 2014.

Dowdy returned to Care First on April 25, 2017. He complained of neck pain that was causing headaches. He stated that his pain had been getting worse since his 2014 accident. He had received several injections with temporary relief. He reported that he had been told by Dr. Gordon that his C6-C7 disc was bulging and possibly leaking, but there was not enough funding in the case to do the surgery. Dowdy stated that his lumbar pain

46

started after the accident, he had fusion surgery, and the pain has continued. Dowdy felt like the pain radiated down into the bilateral lower extremities, and was worse at night. His pain was located in the area of the surgery.

Dowdy returned to Care First on May 11, 2017. He reported intermittent neck pain and aching back pain. He was diagnosed with cervicalgia and cervical radiculitis. He had decreased flexion and extension in his neck. He also had lumbar pain and lumbosacral radiculitis, and his range of motion in his lumbar spine was abnormal.

Dowdy went to Care First on June 7, 2017. He complained of neck pain and lower back pain. He was referred for cervical and lumbar spine MRIs.

A cervical spine MRI was done on June 9, 2017. At C4-C5, the radiologist found broad-based disc protrusion, mild canal and mild bilateral foraminal stenosis with the right worse than the left. At C5-C6, the radiologist found disc protrusion eccentric to the right with mild canal stenosis proximal right foraminal narrowing. The radiologist's impression was multilevel degenerative spondylosis of the cervical spine.

A lumbar spine MRI was also done on June 9, 2017. At L4-L5, the radiologist found minimal disc protrusion, mild facet arthrosis, and no canal or foraminal stenosis. There was no detrimental change following surgery at L5-S1. The radiologist's impression was spondylosis at L4-L5, and post-surgery changes at L5-S1.

Dowdy went to Care First on July 6, 2017. He requested a lumbar injection. He said his neck was doing a lot better, but he had neck pain radiating to his left arm. He had an abnormal range of motion in his neck.

47

He had back pain, radiating pain that comes and goes to both legs, and an abnormal lumbar range of motion.

On July 10, 2017, Dowdy received four medial branch injections at L4-L5 and L5-S1 at Care First.

On August 3, 2017, Dowdy returned to Care First. He reported neck and lower back pain. His neck pain radiated to his left arm. He had good relief from injections. His lower back pain was located in the area of his surgery. Injections provided no relief for his lower back. The frequency of the lower back pain was always.

On September 8, 2017, Dowdy was treated at Care First. His chief complaints were neck pain and lower back pain. He said a spot on his lower back had been hurting since the injections. His left arm hurt when he lifted or rotated it. Dowdy stated he wanted to continue to manage the pain. He had a feeling of knots and tightness in his neck area, he had a history of injections, and the neck pain radiated to his left arm. He described his lower back pain as chronic, and it was aggravated by bending and lying down. Dowdy said he had been working out and it helped, but he had a sore spot in his back that was constant. The pain was not getting better or worse, but just presented a constant feeling of soreness.

On October 13, 2017, Dowdy returned to Care First. He indicated that being busy at work caused on-and-off pain. He felt he was doing okay on that day, but he struggled mostly upon awakening and at night. He described aching neck pain that radiated into his left arm. He had aching lower back pain that was aggravated by bending. He was diagnosed with chronic pain syndrome.

On November 10, 2017, Dowdy was treated at Care First. He complained of constant neck pain, which triggered migraines. His neck pain radiated to his left arm. He also complained of constant lower back pain.

On December 14, 2017, Dowdy reported constant lower back pain when he went to Care First. On the objective tests, he still had neck pain and abnormal range of motion in his neck.

On January 23, 2018, Dowdy's chief complaint was lower back pain when he went to Care First. He reported that he aggravated his back from doing some work over the weekend. His pain scale was 6/10.

On February 22, 2018, Dowdy's chief complaint was lower back pain when he went to Care First. He said he was in constant pain. His history included cervical pain that was ongoing.

Dowdy agreed that he was in consistent pain management care for his neck and back pain with Care First from April 25, 2017, until February of 2018. The pain medications that he received allowed him to continue working. He received a cervical epidural steroid injection on June 19, 2017, and medial branch blocks in his lower back on July 10, 2017.

Dowdy testified that he stopped receiving pain management care in February of 2018 after he left Next Stream and lost his medical insurance. He acknowledged that his pain did not stop in February of 2018, but he just stopped getting treated for it.

Dowdy testified that he continued to have low back pain after his fusion surgery. He described his low back pain as becoming progressively worse after the rupture. He testified that he has dealt with neck pain since the automobile wreck, and that he was still having neck issues before the

49

rupture, but he was able to return to pipelining. His neck pain after the rupture was in different areas and was a different type of pain. He explained that he had pain in the upper part of his neck before the rupture, but since then he has experienced pain in his shoulder blade areas and into both arms.

Dowdy testified that he first went to Care First for treatment following the rupture in September of 2018. He explained that his lawyer had tried setting up appointments for him.

A lumbar spine CT scan was done on September 9, 2019. At L3-4, the radiologist found a minimal annular disc bulge that did not produce spinal stenosis. At L4-5, the radiologist found mild diffuse disc bulging, short facet and ligamentous hypertrophy mildly attenuate to the central canal. At L5-S1, the radiologist found no obvious spinal stenosis and no neural foramina narrowing.

Dowdy was first treated by Dr. Mody on January 26, 2021. Dowdy reported having an anterior lumbar interbody fusion in 2014 for back pain. He told Dr. Mody that his low back felt 100% before the rupture, and he was symptom-free in his neck for at least one year before the rupture.

Dr. Mody reviewed a cervical spine MRI done on December 8, 2018, and found it showed moderate to severe stenosis at multiple levels, C4-5 and C5-6 mainly. He reviewed the lumbar CT scan from September 9, 2019, and found it showed a disc bulge at the level above his fusion. Dr. Mody's diagnoses were cervical stenosis, cervical radiculopathy, cervical spondylosis, cervicalgia, lumbar radiculopathy, lumbago, and lumbar spondylosis with radiculopathy. Dr. Mody ordered a lumbar MRI and discs

of the MRIs to review. He considered Dowdy to be a candidate for an anterior cervical discectomy and fusion ("ACDF").

A lumbar spine MRI done on February 8, 2021, showed the fusion at L5-S1 and a broad-based disc bulge at L4-5. A cervical spine MRI done on March 24, 2021, showed moderate to severe stenosis at multiple levels, mainly at C4-5, C5-6, C6-7, and C7-T1.

On April 21, 2021, Dowdy told Dr. Mody that his low back pain was equal to his neck pain, and he wanted to proceed with medial branch blocks for his low back pain. At the time, Dr. Mody considered Dowdy to be a candidate for lumbar surgery and cervical surgery.

Dr. Mody next treated Dowdy on June 16, 2021. Dowdy reported that the medial branch blocks at L3, L4, and L5 that he received on June 8 continued to give him relief. Dowdy also reported that he still had significant pain in his neck and weakness in his left arm. Dowdy remained a candidate for an anterior posterior decompression and fusion ("APDF") at L4-5, which was at the level above his prior surgery, and an ACDF at C4-7/T1.

Dowdy reported to Dr. Mody on October 6, 2021, that his neck was worse than his low back. A radiofrequency ablation on September 16, 2021, provided complete relief in his low back for two weeks. He recommended that Dowdy continue to treat with Dr. Adair. Dowdy was still a candidate for lumbar surgery. He also recommended that Dowdy have the ACDF because of his moderate to severe cervical stenosis and the failure for time and conservative measures to help him.

51

Dowdy testified that the radiofrequency ablation treatment kept the pain down so he could work but eventually the pain returned.

Dr. Mody last saw Dowdy on January 25, 2022. Dowdy reported no relief from left and right cervical injections administered by Dr. Adair. At that point, Dr. Mody recommended the cervical surgery because of the stenosis and because the injections failed to help much. Dowdy was having some relief from lumbar injections, but was a candidate for lumbar surgery.

Based upon his examination of the MRIs, CT scans, and radiology studies, Dr. Mody believed there were changes in Dowdy's cervical and lumbar spines since the rupture. He agreed the rupture caused or exacerbated his cervical condition requiring an ACDF at C4 through C7-T1. Dr. Mody thought Dowdy injured his neck at C6-C7 in the 2014 car accident. He also agreed the rupture caused or exacerbated his lumbar condition requiring an APDF at L4-L5.

Dr. Mody believed that Dowdy appeared honest. His objective studies and physical exam supported his pain complaints.

Dr. Mody testified that Dowdy reported not having back and neck symptoms before the rupture. Dr. Mody relied on the fact that Dowdy was asymptomatic for at least one year before the rupture to reach his opinion that Dowdy's pre-existing conditions were exacerbated. He asks his patients if they had chronic treatment or were symptomatic for six months to a year before their injury. Dr. Mody acknowledged that he did not have the benefit of any of Dowdy's prior medical records when treating him, but he stated that he did not think those records would have changed the treatment plan.

52

Dowdy brought MRI reports to his first visit with Dr. Mody, but Dr. Mody did not have access to the images at that time.

Dr. Mody noted that a disc bulge at C4-C5 was shown on the MRI taken on April 16, 2014. There was also degenerative narrowing and disc bulge at C5-C6, and disc bulge at C6-C7 with mild central acquired spinal stenosis. These indicated degenerative changes in the cervical spine that predated the 2014 accident, which would have worsened all the degenerative changes. Degenerative arthritis was seen at L3-L4 and L4-L5. Dr. Mody added that Dowdy's job as a welder would contribute to continued degeneration of his cervical and lumbar spines.

Dr. Mody noted that Dr. Gordon thought Dowdy would have to have the C6-C7 level addressed once he recovered from his lumbar surgery. Dr. Mody acknowledged that C4-C5 and C5-C6, which are two of the levels that he recommended for surgery, looked suspicious to Dr. Gordon and were areas that would likely have continued degenerative changes after 2014. According to Dr. Mody, continued long-term degenerative changes were shown on the cervical MRI done in June of 2017.

Dr. Mody also acknowledged that adjacent segment degeneration may occur next to a prior lumbar fusion surgery, which was done at L5-S1. It would likely reveal itself as a disc issue, such as the minimal disc protrusion at L4-L5 shown on the 2017 MRI. Dr. Mody thought that the spondylosis at L4-L5 was a degenerative disc change that existed before the rupture. He also thought the radiologist alluded to no significant changes at L4-L5 on the February 2021 MRI.

53

Dr. Mody testified that the medial branch injections received at L4-L5 and L5-S1 were the same injections that he recommended in January of 2021, and were targeting the same types of pain that existed before the rupture.

Dr. Mody agreed that Dowdy complained of constant back pain as recently as February of 2018. This was inconsistent with what Dowdy reported to Dr. Mody on his first visit. He relied on what Dowdy told him for his determination that the rupture exacerbated his symptoms.

Dr. Mody testified that his opinion is affected to some degree by Dowdy's inaccurate reporting of his prior treatment. He thought toward the end of 2017 and early in 2018, Dowdy's chief complaints were low back pain and not so much the neck symptoms. He thought Dowdy said he was symptom-free in his neck for a year before the rupture but never really said for how long in his lower back. He only said his back felt 100% prior to the rupture.

Dr. Mody believed that Dowdy's stenosis was clearly more significant on his MRIs following the rupture, with moderate to severe stenosis at C4-5, 5-6, 6-7, and 7-1, while previously Dr. Gordon only saw it at C6-7. Dr. Mody thought that Dr. Gordon recommended an ACDF at C6-7 because that was where the herniation and stenosis were, but there was no stenosis at C4-5 and C5-6 in his report and assessment. Dr. Gordon only noted degenerative disc changes at C4-5 and C5-6, but not stenosis.

Dr. Mody agreed that patients with prior surgery will have adjacent segment degeneration. The MRI from February of 2021 showed disc bulge with mild stenosis at L4-L5, which is at the segment immediately above the

54

fusion site. Those same degenerative changes were shown on the MRI from June of 2017. In fact, Dr. Mody testified that it was noted on the 2021 MRI report that there were no significant changes in the lower back from 2017. Dr. Mody agreed that he had no independent medical evidence of a new injury to Dowdy's lower back from the rupture.

The trial court's finding that Dowdy was in relatively good health before the rupture was clearly wrong as he had an extensive and recent medical history involving his lower back and his neck. Thus, the trial court erred in applying the *Housley* presumption to his claims involving his neck and lower back. We now conduct a *de novo* review of those claims.

We find that Dowdy presented evidence proving that it was more probable than not that the rupture caused or exacerbated his cervical condition requiring an ACDF at C4 through C7-T1. Dr. Mody explained that stenosis in Dowdy's cervical spine was clearly more significant on his MRIs after the rupture. He had moderate to severe stenosis at C4-5, 5-6, 6-7, and 7-1, while Dr. Gordon only saw it at C6-7. Dr. Gordon only noted degenerative disc changes at C4-5 and C5-6, not stenosis. We emphasize that there was no expert medical testimony contradicting Dr. Mody's testimony.

However, we find that Dowdy failed to prove that it was more probable than not that the rupture caused or exacerbated his lumbar condition. Dr. Mody thought that Dowdy needed a APDF at L4-5. However, he acknowledged that he had no independent medical evidence of a new injury to Dowdy's lower back from the rupture. Moreover, Dr. Mody

agreed that patients with prior surgery may have adjacent segment degeneration. L4-5 is the segment immediately above the fusion site.

Finally, regarding Dowdy's hearing loss claim, Enable argues that the trial court erred in applying the *Housley* presumption when there was no medical diagnostic or causation evidence of his hearing loss. Enable cites *Harig v. State, Bd. of Elementary & Secondary Educ.*, 25,702 (La. App. 2 Cir. 3/30/94), 635 So. 2d 485, where the trial court rejected a claim for past expenses for hearing aids. While the plaintiff in *Harig* met the first step to apply the *Housley* presumption, this court noted the absence of medical evidence linking the accident and the disability. Enable contends there is no medical evidence in the record concerning the existence or cause of any hearing loss.

Dowdy testified that he did not notice that he had any hearing issues until he got home from the Magnolia job. His claim of hearing loss is somewhat corroborated by other witnesses. Miller testified that he remembered that Dowdy was talking funny after the rupture and said he could not hear Miller. McBride testified that Dowdy had his earplugs in. She described the rupture, at a couple of points, as making a deafening sound. She testified that Dowdy complained to her about his ears and his back immediately after the explosion. While Dowdy did not complain to Nickerson about his hearing for the couple of days following the rupture, Nickerson remembered Dowdy saying something about it a little later, although he was not certain when.

Dowdy had no idea why Roach's invoice showed the hearing aids as being sold on June 6, 2018. He assumed Roach had the dates confused.

In August of 2017, Roach had tested his father-in-law and then asked if he wanted to be tested. Roach told him that his hearing was good. He never saw Roach again before the rupture and had never used hearing aids before. Audiogram results from testing conducted on June 18, 2018, showed that Dowdy had a high-frequency hearing loss on the right and left.

Based upon the evidence at trial, the court properly applied the *Housley* presumption to Dowdy's claim of hearing loss.

## CONCLUSION

We reverse the part of the judgment awarding damages to Dowdy for injuries to his lumbar spine that were allegedly caused by the rupture. We remand this matter to the trial court to reduce the award of special damages for past medical expenses by those amounts attributable to his lumbar spine treatment. In all other respects, the judgment is affirmed. Costs are assessed against Enable.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED**.